UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| F.H. PASCHEN, S.N. NIELSEN & ASSOCIATES LLC | CIVIL ACTION |
| versus | NO. |
| HISCOX, INC. ON BEHALF OF CERTAIN UNDERWRITERS AT LLOYD'S, LONDON, AND/OR HISCOX USA AND/OR HISCOX SYNDICATES FOR AND ON BEHALF OF HISCOX SYNDICATE 3624 AT LLOYDS, YORK RISK SERVICES GROUP, INC. (F/N/A YORK CLAIMS SERVICE, INC.), AND MADSEN, KNEPPERS AND ASSOCIATES, INC. | SECTION |

**COMPLAINT FOR DECLARATORY
JUDGMENT AND DAMAGES**

TO THE HONORABLE JUDGES OF THIS COURT:

NOW COMES F. H. Paschen, S. N. Nielsen & Associates LLC ("Paschen") to submit, through undersigned counsel, this Complaint for Declaratory Judgment and damages against Hiscox, Inc. on behalf of Certain Underwriters at Lloyd's London, and/or Hiscox USA and/or Hiscox Syndicates for and on behalf of Hiscox Syndicate 3624 at Lloyds ("Hiscox"), York Risk Services Group, formerly known as York Claim Service, Inc. ("York"), and Madsen, Kneppers and Associate, Inc. ("MKA"). For its Complaint, Paschen states as follows:

## JURISDICTION AND VENUE

1.

Paschen is a foreign corporation organized and existing under the laws of and domiciled in the State of Illinois and authorized to do business in Louisiana.

2.

Hiscox is, upon information and belief, a foreign business entity domiciled in the State of Delaware with its principal place of business in the State of New York.

3.

York is, upon information and belief, a foreign business entity domiciled in the State of New York with its principal place of business in the State of New Jersey.

4.

MKA is, upon information and belief, a foreign business entity domiciled in the State of Colorado with its principal place of business in the State of California.

5.

Jurisdiction herein is founded upon diversity of citizenship, 28 U.S.C. § 1332, as the parties are of diverse citizenship and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

6.

Venue is proper in the Eastern District of Louisiana pursuant to 28 U.S.C. § 1391 (b)(2)-(3) as the events that give rise to the claim occurred in this District.

## BACKGROUND

### 7.

Paschen is the general contractor on a project involving the construction of South Plaquemines High School (the "Project"). The South Plaquemines Parish High School Project was approximately 89% complete when Hurricane Isaac made landfall on the coast of Louisiana on August 28, 2012.

### 8.

Hiscox issued Builders Risk Policy Number UNS2511179.10 (the "Policy") to Paschen on September 7, 2010 specifically insuring against loss on the Project. The Policy was in force and effect on the date Hurricane Isaac made landfall. *See* Exhibit 1.

### 9.

Paschen paid all of the required premiums for the coverage provided under the Policy.

### 10.

Because of the damage caused by Hurricane Isaac to the Plaquemines community, Paschen was not permitted to return to the Project site until September 5, 2012, eight days after Hurricane Isaac made landfall. Among other things, Hurricane Isaac caused major highways to be flooded and covered with storm debris.

### 11.

Paschen was permitted to inspect and begin assessing damage to the Project site on September 5-7, 2012 via police escort along the levee system. During this period Paschen began to assemble emergency labor and management crews to begin debris removal.

12.

On September 7, 2012, Paschen notified Hiscox in writing of a potential claim under the Policy for damage to the Project due to Hurricane Isaac. *See* Exhibit 2. To assist Paschen in developing and pursuing its claim under the Policy, Paschen retained the services of Marsh & McLennan Companies ("Marsh"). Hereafter, reference to actions taken by "Paschen" to document and present for adjustment its claim under the Policy refers to actions taken by either Paschen or Marsh on Paschen's behalf.

13.

For eleven days after Hurricane Isaac made landfall, South Plaquemines Parish remained under police and Army Corps of Engineers control for access. On September 10, 2012, civilians that had been evacuated were allowed to re-enter South Plaquemines Parish.

14.

Upon its return to the Project site, Paschen endeavored to mobilize an emergency labor and management crew, which eventually expanded to over fifty laborers and additional management personnel to achieve debris removal and facilitate clean up.

15.

On September 11, 2012, Paschen hired a consultant to perform air monitoring and assessment to ensure the safety of those working at the Project site. The consultant, Environmental Auditors of America ("EEA"), was retained to direct removal of contaminated materials and remained onsite full time through December 2012. Thereafter, EEA returned to the site on a weekly basis (through July 2013) to assess any additional damage and air quality issues.

4

16.

On September 17, 2012, two representatives of MKA arrived on the Project site to walk the site and plan for an MKA assessment team to inspect the site.

17.

Between September 21, 2012 and October 1, 2012, Paschen's estimating and assessment teams worked at the Project site to begin identifying the extent of the damages to the Project and, among other things, to meet with retained electrical and mechanical consultants regarding necessary repairs.

18.

In connection with its own investigation and to document the extent of damages to the Project, Paschen took over 2,200 pictures of the Project site, inspected every space in the building, and began to assemble a 16-volume detailed estimate of repairs necessitated by the damages wrought by Hurricane Isaac's winds and rain.

19.

Between September 17, 2012 and December 13, 2012, MKA sporadically sent personnel to the Project site to assess the damages. The majority of the site visits lasted a few hours.

20.

Throughout September and October 2012, Paschen clean-up crews continued to remove debris and repair damaged enclosures. Included in the work was power washing of interior and exterior surfaces to remove salt water spray from the storm. Numerous surfaces showed accelerated corrosion as a result of the wind-driven salt spray occasioned by Hurricane Isaac.

21.

On November 20, 2012, Paschen submitted to York a 16-volume initial damage estimate and corresponding detailed estimate for repairs totaling in excess of $33 million.

22.

By the end of 2012, *four full months after Hurricane Isaac and two months after submission of repair estimates*, Hiscox had failed to advance any funds under the Policy to assist Paschen with debris removal, clean up, remediation of the Project site, or repairs to the site.

23.

On January 2, 2013, Paschen received an Initial Loss Estimate from York and MKA totaling $6.25 million, substantially lower than the loss estimate submitted by Paschen in 16-volume detail.  The Initial Loss Estimate made no reference to Paschen's detailed estimate. York advised Paschen at that time that it requested an advance payment of only $1.5 million from Hiscox.

24.

On January 30, 2013,

- *five months* after Hurricane Isaac made landfall;

- *four months* after MKA began visiting the Project site to inspect the damages; and

- *two months* after Paschen submitted a 16-volume estimate of damages exceeding **$30 million**;

Paschen received an initial advance from Hiscox in the amount of $1,515,903.90.

6

25.

On February 6, 2013, Paschen's management met with representatives of York and MKA to discuss the status of and difficulties involved with maintaining a repair schedule without the timely payment of funds due under the Policy. Paschen's management also stressed at that meeting the importance of having the Project site completed for the 2013-2014 school year for teachers and students in South Plaquemines Parish, who had been without a permanent school building since Hurricane Katrina in 2005.

26.

At the February 6, 2013, meeting, Paschen identified to York and MKA substantial flaws in MKA's initial loss estimate of $6.25 million including but not limited to: (1) MKA's use of inaccurate and low square footage in the estimate; (2) MKA's failure to take into account the true unit costs for work in the Plaquemines area; and (3) key items of damage that were omitted on MKA's estimate. Using accurate square footage and unit costs, the true initial loss estimate, *even under York/MKA's calculations*, was approximately **$22.8 million**.

27.

At the February 6, 2013 meeting, York and MKA advised that they would respond to Paschen's November 20, 2012, estimate of damages shortly.

28.

Paschen offered at the February 6, 2013 meeting to provide to York and MKA detailed documentation of the **actual** repair costs sustained by Paschen through that date. York specifically stated that Paschen should **not** submit documentation of Paschen's actual costs to date and that settlement and payment of Paschen's claim "should not take that long."

29.

At the end of the February 6, 2013, meeting, York advised Paschen that it would recommend to Hiscox that it advance an additional $4.5 million to Paschen under the Policy.

30.

On February 21, 2013, Paschen received a second advance payment of $3,168,203.31 from Hiscox.

31.

On February 27, 2013, Paschen received MKA's report and response to Paschen's November 20, 2012, 16-volume detailed estimate of repairs – **more than three months** after the estimate was originally provided to York.

32.

After February 27, 2013, and at York's request, Paschen sent to York an updated repair report, which report identified substantial savings in Paschen's repair and replacement costs due to significant mitigation steps that Paschen was able negotiate with the Project owner.  As a result of Paschen's mitigation effort and other revisions, the updated repair estimate sent to York totaled $18.9 million.  Paschen sent an additional updated repair report to York on March 22, 2013.  Hiscox, York, and MKA have never acknowledged or responded to the substance of these updated reports.

33.

On April 8, 2013, Paschen directly responded to MKA's February 27, 2013, report and response.  Paschen's response included documentation of damages not noted or addressed by MKA with specific references to the November 20, 2012, report of damages and estimates of repairs submitted by Paschen.

8

34.

On April 26, 2013, Paschen submitted a third updated repair report, which estimated the total damages due under the Policy at $22.8 million, including approximately $4 million in contingencies for work not yet finalized or contingency repairs that may be hidden behind other trades' work.

35.

On the same day, April 26, 2013, York requested that Paschen submit support for the actual costs Paschen had incurred repairing the damage occasioned by Hurricane Isaac to support the scope of work set forth in the updated repair estimates. Paschen was requested to submit this support prior to a scheduled May 1, 2013, meeting that had been scheduled.

36.

In response to York's request, Paschen reminded York that in late February, it specifically instructed Paschen **not** to provide the information it now requested.

37.

During the pendency of York and MKA's purported investigation and adjustment of its claim under the Policy, Paschen dipped significantly into its own funds to pay consultants, subcontractors, and laborers to keep the repair project moving forward and to ensure that the school would be open for the 2013-2014 school year. The total amount of costs incurred as of April 1, 2013, was $11,519,677.64, and the total cost incurred as of July 31, 2013, was $15,680,551.56.

38.

At the May 1, 2013 meeting, eight months after Hurricane Isaac made landfall and five months after Paschen submitted its 16-volume estimate of repairs, York and MKA requested

copies of the documentation of actual costs incurred by Paschen supporting Paschen's April 8, 2013, submission.  At the end of the May 1, 2013 meeting, a York representative approached Paschen and reiterated that the claim was "very close" to be settled.  Paschen was led to believe that a favorable settlement would be entered into shortly after MKA had an opportunity to review the documentation of actual costs incurred for repairs.

39.

Between May 3, 2013 and May 7, 2013, Paschen sent twelve (12) 5" binders containing the requested supporting documentation to York.

40.

On May 13, 2013, Paschen requested an additional advance of $8.5 million, which amount was more than fully supported by the documentation of actual costs submitted to York. Paschen made this request in an effort to relieve some of the financial burden on Paschen of financing the repairs caused by Hurricane Issac.

41.

On May 16, 2013, additional information was forwarded to York, including a light fixture testing report by an outside, third party testing agency.  The report confirmed that almost all of the light fixtures at the school would have to be replaced.

42.

By May 20, 2013, MKA still had not completed its review of Paschen's various submissions.  In an effort to move the adjustment of its claim forward, Paschen offered to meet with MKA representatives to review and answer any questions MKA may have regarding the claim documentation.   Neither York nor MKA responded to Paschen's offer.

10

43.

Not having heard from York regarding the much needed additional advance, Paschen contacted Hiscox directly seeking added payment under the Policy of its documented repair costs. Hiscox advised Paschen that it could not advance any additional funds because it was initially relying upon MKA's review and determination of the claim documentation, which remained incomplete.

44.

On June 29, 2013, almost two months after York had the detailed documentation of the actual costs incurred by Paschen on the repair project, York advised Paschen that MKA had revised its estimate of the value of Paschen's claim from $6.25 million to $7.776 million and that Paschen would receive an additional advance payment of $2.082 million. York did not provide any explanation of how MKA calculated the new value of the claim.

45.

On July 8, 2013, Paschen received a third advance payment in the amount of $2,082,959.00, bringing the total amount received and advanced by Hiscox on Paschen's claim to approximately $6.7 million.

46.

On July 12, 2013, Hiscox agreed to meet in Chicago on July 31, 2013 to further discuss Paschen's claim under the Policy. Hiscox further noted in writing the following: "The view from our perspective is that we have provided a significant amount of information to you [Marsh] and the Insured [Paschen] and received little back in response." *See* Exhibit 3. Considering the massive amount of documentation submitted by Paschen to York and MKA, including the 16-volume estimate of repairs, the 12-volume report of actual costs incurred, which documentation

11

was initially offered to York and MKA on February 6, 2013, and rejected and subsequently updated and supplemented on July 16, 2013 with three additional binders of documented repair costs, Hiscox's comment was entirely unfounded.

47.

On July 12, 2013, Hiscox also provided MKA's Loss Measure, which was wholly inadequate in terms of analysis of Paschen's claims.

48.

MKA's Loss Measure provided no detailed analysis of Paschen's 16-volume estimate of the repair costs and no calculations or documentation to support its own estimate of the repair scope of work and duration of same. Further, MKA provided no detailed analysis of Paschen's 15-volumes of documentation of actual costs incurred for repairs.

49.

On July 19, 2013, Paschen responded in detail to MKA's Loss Measure.

50.

On July 31, 2013, Paschen met again with Hiscox, York and MKA to discuss Paschen's claim under the Policy. After that meeting, Hiscox advised Paschen that no further payment would be made under the Policy on Paschen's claim under the Policy.

51.

As of September 13, 2013, Paschen had incurred over $17 million in repair costs that were due and owing under the terms of the Policy and had received less than half of that amount from Hiscox.

12

## COUNT I: DECLARATORY JUDGMENT
(As against Hiscox)

52.

Paschen re-alleges and re-avers each and every allegation set forth in paragraphs 1 through 51 as though fully set forth herein.

53.

The Hiscox Policy provides coverage up to $37,164,000.00 for losses at the insured Project site.

54.

On September 7, 2012, Paschen provided Hiscox with prompt notice of loss at the insured site as a result of Hurricane Isaac. *See* Exhibit 2.

55.

York advised Paschen that it had been assigned by Hiscox to investigate and analyze the loss sustained at the insured property due to Hurricane Isaac.

56.

Between August 28, 2013, and January 15, 2013, York issued no reservation of rights. On January 15, 2013, four and a half months after beginning its investigation and during which period Paschen worked to repair the Insured Project, the first reservation of rights was issued. York specifically noted that "the Policy is subject certain limits and/or sub-limits that may apply to restrict portions of the claim presented as a result of" losses incurred due to Hurricane Isaac.

57.

The January 15, 2013, reservation of rights letter also noted certain excluded perils, namely, "consequential loss, loss of market or delay in completion, liquidated damages, performance penalties, penalties for non-completion and delay in completion." York's letter also recognized that the "loss to property . . . is measured as the '[c]ost to repair or replace the property lost or damaged at the time and place of loss . . . ."

58.

Neither York nor Hiscox raised any other specific exclusions or specific limits to coverage.

59.

Such general language is insufficient to reserve defenses under the Policy as it failed to adequately advise Paschen of any other defenses Hiscox might rely upon.

60.

Any defenses other than those raised in the letter of January 15, 2013, are waived.

61.

Further, Hiscox is equitably estopped from raising any additional defenses to coverage under the Policy.

62.

On May 29, 2013 -- nine full months after Hurricane Isaac during which time, Paschen worked to repair the damage occasioned by the hurricane and six months after it fully informed York of the damages sustained -- York issued a second reservation of rights letter asserting the same sub-limits identified in the January 15, 2013, letter and multiple other limitations and exclusions.

14

63.

For the first time, York referenced a $2.5 million sub-limit for loss or damage to the Insured Property arising from rain, whether wind driven or not, entering the interior of any insured building or structure when the roof and walls are incomplete.  Inconsistent with belated reference to the wind driven rain sub-limit, Hiscox had already advanced sums in excess of the referenced sublimit.  Moreover, the advance payments received from Hiscox, through York, did not reference any particular sublimit or refer to any documentation by which Paschen might be able to ascertain whether the payments were made pursuant to particular sublimit.

64.

The wind driven rain sub-limit is not applicable to Paschen's claim.  Rather, the "Named Windstorm" (*i.e.*, Hurricane Isaac) sub-limit of $37,164,000 is applicable to Paschen's claim.  Hiscox has conceded and acknowledged this by assessing the Named Windstorm deductible to the claim.  From the beginning, Hiscox, through York, asserted a deductible of $984,004, or 3% of the value of the total insured value under the Policy with respect to the "Named Windstorm" sublimit.

65.

An actual and justiciable controversy exists between the parties as to which a declaratory judgment setting forth their respective rights and obligations under the Policy is necessary and appropriate.

66.

Paschen is entitled to Declaratory Judgment, pursuant to 28 U.S.C. §§ 2201- 2202, concerning the respective rights and obligations of the parties under the Policy in connection with the Pachen's claim.

15

## COUNT II: BREACH OF CONTRACT
(As against Hiscox)

67.

Paschen re-alleges and re-avers each and every allegation set forth in paragraphs 1 through 66 as though fully set forth herein.

68.

Paschen timely submitted and updated documentation to York in support of its claim for repairing the damages and losses sustained by Hurricane Isaac. Moreover, the Insured Project site was made available to Hiscox, York and MKA so that it could adequately inspect and adjust the claim.

69.

The Hiscox Policy referenced above affords coverage in the amount of $37,164,000 for "**all risks** of direct physical loss of or damage to insured property while at the location of the Insured Project [South Plaquemines Parish High School] . . . ." Part A.1. (Emphasis added.)

70.

Part A.2.A. of the Policy further provides that the Property Insured includes

(1)     Permanent Works - All materials, supplies, equipment, machinery, and other property of a similar nature being property of the Insured or of other for which the Insured may be contractually responsible, the value of which has been included in the estimated value of the **INSURED PROJECT**\* in the DECLARATIONS, all when used or to be used in or incidental to the . . . fabrication or assembly, installation or erection or the construction of or alteration, renovation, rehabilitation of the **INSURED PROJECT**\*.

(2)     Temporary works - All scaffolding, form work, fences, shoring, hoarding, falsework and temporary buildings all

16

incidental to the project and the value of which has been included in the estimated value of the **INSURED PROJECT\*** in the DECLARATIONS.

71.

Part A.3.i of the Policy provides coverage for direct physical loss or damages that cause the enforcement of any law or ordinance in effect at the time of loss that regulates the repair, rebuilding or re-construction of the damages portions of the project, including the increased cost of repair, rebuilding or re-construction of the damaged portions.

72.

Part A.3.j of the Policy provides that in the event of direct physical loss or damage, Hiscox will pay extra expenses incurred as a result of the loss or damage. "Extra Expense" is defined as:

> the reasonable and necessary excess costs incurred during the period of restoration and repair that are over and above the total costs that would normally have been incurred during the same period of time had no loss or damage occurred.

> Extra expense shall include, but not be limited to equipment rental, emergency expenses, temporary use of property, demobilization and remobilization or equipment and facilities and expenses necessarily incurred to reduce loss excluding, however, any Additional Interest Expense, Debt Service, Business Interruption, Loss of Income, Loss or Earnings, Loss of Rents or Delay in Completion and/or Acceleration Expense."

73.

The Policy also provides coverage for debris removal and "necessary and reasonable compensation of architect's or engineer's services and expenses incurred by the Insured in connection with the repair or replacement of the **INSURED PROJECT\***, but excluding any

17

relating to improvements or betterments to the **INSURED PROJECT\*.**"   (Part A.3.g. and A.3.o.)

74.

The damages and losses claimed by Paschen were the direct result of Hurricane Isaac and were covered under the Policy.  Accordingly, Hiscox has a duty to pay Paschen for the insured damages and losses sustained.

75.

Hiscox unreasonably and arbitrarily failed to tender payment for the appropriate amount of Paschen's covered loss and damages.  It is now more than **twelve months** since Hurricane Isaac damaged the insured property, **ten months** since a detailed damage estimate was submitted to York, and **four months** since Paschen furnished documentation of its actual costs then incurred for covered repairs.

76.

Hiscox failed to timely and reasonably pay the covered amounts due Paschen under the Policy.  As a result of Hiscox's failure and breach, Paschen has incurred damages, in an amount to be proven at trial, but in excess of $12 million.

**COUNT III: STATUTORY VIOLATIONS**
(As against Hiscox)

77.

Paschen re-alleges and re-avers each and every allegation set forth in paragraphs 1 through 76 as though fully set forth herein.

18

78.

On November 20, 2012, Paschen submitted to York a 16-volume initial damage estimate and corresponding detailed estimate for repairs totaling in excess of $33 million.

79.

Despite the urgency of timely repair work, Hiscox advanced no sums under the Policy for repair of the damage or loss until January 30, 2013, when Paschen received the sum of $1,515,903.90 and $25,000.00 from York Risk Services.  This sum represented less than 4% of the total loss and damage estimate documented on November 20, 2012 by Paschen.

80.

One month later, on February 21, 2013, Hiscox issued an additional $3,168,203.31 for loss and damage arising from Hurricane Isaac.  As of February 21, 2013, the total paid by Hiscox was $4,709,107.21 or approximately 14% of the total loss and damage sustained and detailed by Paschen in November 2012.

81.

On June 21, 2013, almost ten months after Hurricane Isaac made landfall, York advised Paschen that it had reviewed Paschen's claim documentation and has determined that the final, total covered amount due relating to damage arising out of Hurricane Isaac is $7,776,071.00. Taking into account the deductible, the total "to be paid" amount for loss and damage according to York was $6,792,066.21, or approximately 30% of the loss and damage actually sustained and documented in detail by Paschen.

82.

Hiscox has arbitrarily, capriciously and without probable cause refused to pay the amount due Paschen under the Policy.

83.

Hiscox has failed to timely and promptly adjust the claims presented and failed to timely issue payments under the Policy as required by law. Hiscox has breached the Policy in bad faith pursuant to La. Civil Code article 1997. Paschen is entitled by law to all damages, whether foreseeable or not, that are a direct result of Hiscox's breach, including attorneys' fees.

84.

Pursuant to La. Revised Statute 22:1892(A)(1), Hiscox was obligated to pay Paschen any amount owed to Paschen within 30 days of receipt of proof of loss, and failed to do so. As a result of that failure, which was arbitrary, capricious and without probable cause, Hiscox is liable for all amounts due under the policy, plus 25%, pursuant to Louisiana Revised Statute 22:1892(B)(1).

85.

Pursuant to La. Revised Statute 22:1973(A), Hiscox owed Paschen a duty of good faith and fair dealing and had an affirmative duty to adjust Paschen's claims fairly and promptly. Hiscox breached these duties and is liable to Paschen for all damages as a result of the breach.

86.

Pursuant to La. Revised Statute 22:1973(B)(5), Hiscox breached its duties of good faith and fair dealing and its affirmative duty to adjust claims fairly and promptly when it failed to pay Paschen within 60 days of receipt of satisfactory proofs of loss and such failure was arbitrary,

20

capricious, and without probable cause.   As a result, pursuant to La. Revised Statute 22:1892(A)(3) and La. Revised Statute 22:1973(C), Hiscox is liable for penalties in the amount of two times the damages sustained by Paschen.

87.

As a direct and proximate result of Hiscox's actions, Paschen has sustained damages, in an amount to be proven at trial, including but not limited to attorney's fees.

**COUNT IV: NEGLIGENCE**

(As against York and MKA)

88.

Paschen re-alleges and re-avers each and every allegation set forth in paragraphs 1 through 87 as though fully set forth herein.

89.

Hiscox initially provided York with actual or apparent authority to adjust Paschen's claim.   York retained MKA to assist it in adjusting the claim and provided MKA with actual or apparent authority to adjust Paschen's claim.   Hiscox accepted and acknowledged the actual or apparent authority of MKA.

90.

Hiscox, York and MKA were given access to the insured Project site following Hurricane Isaac, allowing them adequate opportunity to inspect and adjust the loss.   The damages caused to the insured Project by Hurricane Isaac are presently estimated to be in excess of approximately $20 million.

21

91.

Because of its contract with and commitment to the Plaquemines community and its students, Paschen promptly assessed Hurricane Isaac caused damages to the Project and began cleaning up and repairing the damage such that students could attend classes in the new facility in the fall of 2013.

92.

Although Hiscox issued three advance payments under the Policy, substantial amounts are still due to Paschen under the Policy.  York, Hiscox, and MKA have been provided detailed documentation supporting actual repair costs in excess of approximately $17 million.

93.

By virtue of the actual or apparent authority granted to it by Hiscox, and based on its use of such authority as witnessed by its communications and promises to Paschen, including that of timely payment and prompt adjustment of its claim, York undertook a responsibility toward Paschen of good faith and fair dealing and the responsibility of adjusting Paschen's claims properly, promptly, and fairly.

94.

By virtue of the actual or apparent authority granted to it by Hiscox and York, including Hiscox's express reliance upon only MKA's calculations of loss, and based on its use of such authority in its communications to York and Paschen regarding the adjustment of Paschen's claim, MKA undertook and assumed the same duty and responsibility of good faith and fair dealing and the duty of adjusting Paschen's claims properly, promptly, and fairly.

22

95.

At a minimum, York and MKA failed to: (i) properly and adequately investigate the extent and nature of the losses and damages at the insured property; (ii) timely and thoroughly review and assess the substantial documentation provided by Paschen in support of its claim; (iii) approve advances to Paschen when due and owing under the Policy; (iv) timely and adequately address and respond to the deficient measure of loss notice of January 2013; (v) appreciate the urgency of Paschen's need to complete the Project for the school to open on time for the school year and unnecessarily delayed the adjustment process.

96.

York and MKA misrepresented to Paschen the status of the adjustment process, and York repeatedly stated or implied that the claim would be quickly resolved and that the parties were not far apart on the amounts due and owing under the Policy.

97.

Based on statements made to Paschen by Hiscox, upon information and belief, York failed to provide Hiscox with the documentation and support that Paschen had provided to York in support of the claim or otherwise acted outside the scope of its authority.

98.

York's and MKA's adjustment of Paschen's claim has been arbitrary, capricious, and in bad faith.

99.

As a direct and proximate result of York's and MKA's actions, Paschen has sustained damages, in an amount to be proven at trial, including but not limited to attorney's fees.

## COUNT V: NEGLIGENT PROFESSIONAL UNDERTAKING

(As against York and MKA)

100.

Paschen re-alleges and re-avers each and every allegation set forth in paragraphs 1 through 99 as though fully set forth herein.

101.

The adjustment of Paschen's claim required professional expertise and experience in construction and engineering matters.  York and MKA held themselves out to possess such professional capabilities.  York and MKA, through the actions set forth above, intentionally and negligently performed their professional duties and obligations to Paschen's detriment.

102.

Among other things, York assumed a duty to Paschen to timely and responsibly investigate the loss and adjust Paschen's claims, and not to interfere with Paschen's ability to perform the repairs of the Insured Project by delaying adjusting the loss and damage and approving payments for the repair work.

103.

York's negligent professional adjustment of Paschen's claim was an act that York had to have known would directly affect Paschen.  It was foreseeable and fairly certain that Paschen would suffer – and has suffered – economic harm if York adjusted the insurance claim negligently.

104.

In its role as professional construction consultant, MKA, through the actions set forth above, intentionally and negligently performed its services all to the detriment of Paschen.

24

105.

MKA assumed a duty to Paschen to timely and responsibly investigate the loss and adjust Paschen's claims, and not to interfere with Paschen's ability to timely perform the repairs of the Insured Project by delaying adjusting the loss and damage and approving payments for repair work.

106.

MKA's negligent adjustment of Paschen's claim was an act that MKA had to have known would directly affect Paschen.  It was foreseeable and fairly certain that Paschen would suffer economic harm if MKA investigated and analyzed the insurance claim negligently.

107.

As a direct and proximate result of York's and MKA's actions, Paschen has sustained damages, in an amount to be proven at trial, including but not limited to attorney's fees.

108.

Paschen prays for trial by jury.

**WHEREFORE**, Paschen respectfully prays that:

(1)     Coverage under the Hiscox Policy be established in accordance with the terms of the Policy and applicable law, including application of the Named Windstorm sublimit only;

(2)     Judgment be entered against Hiscox for breach of contract and that damages be awarded in an amount to be proven at trial;

(3)     Judgment be entered against Hiscox for violations of the Louisiana Code statutes as pled herein and that damages be awarded at an amount proven at trial including

all applicable statutory penalties, together with pre-judgment interest, and post-judgment interest, attorneys fees and costs;

(4)     Judgment be entered against York and MKA for their negligence in adjusting Paschen's claim and that damages be awarded in an amount to be proven at trial;

(5)     Judgment be entered against York and MKA for their negligent professional undertaking and that damages be awarded in an amount to be proven at trial; and

(6)     This Court grant any other equitable and general relief it deems appropriate.


Respectfully submitted,


JAMES M. GARNER (#19589) (T.A.)
DOROTHY S. WATKINS LAWRENCE (#21137)
HOWARD T. BOYD (27186)
**SHER GARNER CAHILL RICHTER**
**KLEIN & HILBERT, L.L.C.**
909 Poydras Street, Suite 2800
New Orleans, Louisiana 70112
Telephone: (504) 299-2100
Facsimile:  (504) 299-2300
jgarner@shergarner.com

**ATTORNEYS FOR F. H. PASCHEN, S. N.**
**NIELSEN & ASSOCIATES LLC**